Our next case we'll hear this morning is United States v. Mosley, and Mr. Stolker, whenever you're ready, we'll hear from you. Good morning. May it please the Court, my name is Richard Stolker. I was appointed by this Court to represent Clifton Mosley in this appeal, and I thank the Court for that appointment. In our brief, we raised a number of issues. With the Court's permission, I'd like to address the issue of sufficiency, which I believe is the most intriguing issue in this case. I say it's intriguing because the government put on a ton of evidence. They put on 38 or 39 witnesses, they introduced over 300 pieces of evidence, and the case was tried over a three-week period. And yet, it's our contention that the government totally failed to prove the elements of the crimes with which Mr. Mosley was charged sufficiently as a matter of law. So I'd like to address those issues, if I may. First of all, a great deal of the evidence in the case centered around cell tower locational information. That is where certain cell phones purportedly were located at important time frames in the case. There was no evidence put on at all that the cell phones that were registered to Mr. Mosley and to Mr. Carter were in fact on their persons at the critical times that the government contended at the time and place of the shooting. Each of these individuals had multiple cell phones. They had burner phones, they had phones that belonged to girlfriends in some cases, and in the case of Mr. Carter, for example, his cell phone never left his home. His principal cell phone stayed in his home during the time of the shooting. He had a different cell phone on his person. The FBI agent who presented most of the cell tower locational information, Agent Wild, conceded that the cell tower evidence can only show roughly where... Carter's cell phone was always on Carter or Mosley's cell phone was always on Mosley? Then after the shooting, Carter goes to his home or maybe never left his home, takes his cell phone and goes to Myrtle Beach. I don't think that's a critical issue, but I think it's... I just want to make sure which one you were talking about. I just missed... Locational information is not terribly specific. It doesn't identify exactly where somebody is. Cell phones don't necessarily ping the nearest tower. They ping the tower with the strongest signal, which may not be the closest tower. It's possible there's a tower here, but a building blocks the line of sight, so the cell phone pings a tower a quarter mile or whatever away. It's also, and I think this gets more to our central point, the presence, even if the cell phones establish, and I don't think they do, but even if they establish that the individuals were in the neighborhood where the shooting occurred, that's all it shows. It doesn't show that Mr. Carter was the shooter, as the government theorizes. It doesn't show that Mr. Mosley was the presumptive getaway driver, as the government theorizes. This was a neighborhood in Baltimore City where the defendants, Carter, Mosley, and also Hightower, who was incarcerated at the time, had been selling drugs, had been selling marijuana and sometimes other drugs over a long period of time. It wasn't unusual for them to be there. The connection to the shooting is what the government asked the jury to theorize, as the government had. They're in the neighborhood, so they perhaps, probably, maybe, I don't think beyond a reasonable doubt, must have been the shooters. It's important to recall that the only witness who actually saw the event was a witness named Murray, and the best she could do was to say that she saw the shooter shoot the decedent, Ms. Ashburn, and then leave the area, run or walk away very quickly. But she could only describe the individual as a tall black man with a hoodie and jeans. I submit that that description could fit half of the population of Baltimore or half of the population of any city. She was not able to identify Mr. Carter from a photo array, and that's all the government had in terms of identification. They had a Pontiac Grand Am sitting in an apartment parking lot nearby. The vehicle was registered to an associate of Mr. Mosley, and from that the government theorizes that he was the presumptive getaway driver. There was no traditional forensic evidence. They did recover a bullet from the decedent's body, but there was no weapon ever found that matched up with that. There was no, any kind of forensic evidence. There was no video recorded that showed anything more than a grainy picture of somebody indescribable in the area. So what we're left with is individuals, Mr. Carter, Mr. Mosley, in the area, not unusual, where a shooting occurred. There was a case that I saw only last night at 9 o'clock when I arrived in Richmond because it was decided yesterday by the name of Hawkins, Tremaine and Hawkins. It's number 244502, and it was decided just yesterday, opinion written by Judge Benjamin. It was a Fourth Amendment case, but there's some language in there that I thought was particularly pertinent to this case. Hawkins' case was a traffic stop, and the language in there that I wanted to direct the court's attention to is, and I'm paraphrasing because I don't have the exact case in front of me, courts are skeptical of government attempts to spin mundane acts into a web of deception. The court also goes on to say that anything less would invite intrusions upon constitutional and guaranteed rights based on nothing more substantial than inarticulate hunches. Now that maybe overstates a little bit what we have in this case, but we really don't have anything constituting proof. What proof is required under Section 1512 and 1513 is that there has to be an intention to prevent a witness from providing testimony or appearing at a proceeding. That's the critical element that's missing. Where is the evidence that Mr. Mosley, or for that matter, Mr. Carter, intended to silence not the person who was shot, but the person who they, under the government's theory, intended to shoot? There's no evidence in the case that there was a discussion between Mr. Hightower and Carter and Mosley about the intended witness, whose name momentarily escapes me. I'm sorry, I can't remember her name at the moment. Lisa Edmonds, you mean? No, I don't think that's correct. Lisa, I'm sorry, I don't remember her name. But in any event, there's no evidence that there was any discussion. There were discussions between Hightower, even when he was incarcerated, and Mosley and Carter. They had frequent discussions. They met. They had breakfast together at the IHOP. They talked on the telephone. They texted each other. But that doesn't take you anywhere because they were in the business of selling drugs together. There's no evidence that they discussed. I think her name, no, I'm sorry, I still don't remember her name. But there's no evidence that Hightower asked or even intimated that Carter and Mosley should take out. It was Lisa Edmonds. It was Lisa Edmonds. Okay. Thank you. I'm sorry, I couldn't remember. There's no indication that there was this plan in progress that the government theorized. At best, we have individuals who are in the area. They're selling drugs on a regular basis. They're in touch with each other. The frequency of communications between Carter and Mosley increased when Mr. Hightower went to jail because he was their supplier. But he wasn't the only supplier. They had another individual. I believe his name was Sheldon Grant. And there were, I'm sure, no shortage of marijuana suppliers in Baltimore City from which they could have purchased their product for resale. Was there evidence that Lisa Edmonds was cooperating or assisting the police in any way? Yes. She was the one that reported Mr. Hightower's alleged fraud. So, yes. Does that answer Your Honor's question? Yes, thank you. Okay. Beyond that, unless the Court has any questions.  Thank you, Mr. Stalk. You have reserved some. Yes, I will reserve the balance of my time. Thank you, Your Honor. All right, Mr. Medinger. Good morning, Your Honors, and may it please the Court. I'm Jason Medinger. I'm here on behalf of the United States. Your Honors, the jury properly convicted Clifton Mosley for his role in the murder of Latrina Ashburn and for the offenses charged in the indictment. As such, we respectfully ask that this Court would affirm. Because my colleague started with sufficiency, unless the Court has different questions, I'll start with that issue. That issue, as you know, is a very steep hill to climb for the defendant. The jury, as you heard, heard more than 30 witnesses, more than 300 exhibits. There's an enormously heavy burden that a defendant has to surmount in order to countermand a jury's finding here. And the jury here found that Mr. Mosley was guilty of the offenses for which he was charged. And I'll just dwell briefly on some of the facts that the government presented. Because my colleague mentioned, you know, cell phones. That only tells a very small slice of the picture. And you have to look at things wholly in the totality of the circumstances. And here, I think you have to start with the relationships. You have to start with the fact that we established that there was a relationship, both a business relationship and a friendship, between Mr. Hightower, who was at the apex of a drug trafficking conspiracy. He was then assisting his what are called right-hand men, his lieutenants, if you will, Mr. Davon Carter and Mr. Clifton Mosley. So they were in this friendship. They were doing drug trafficking together. The testimony proceeds that Mr. Hightower relayed to both of them that he was in trouble. He was having legal trouble because he had a healthcare fraud case that was being presented against him. And so the testimony then came in that Mr. Hightower ultimately was detained. And that was an existential threat to both their friendship, because he was potentially going to go away to prison for a while, but also an existential threat to the drug trafficking. And so Mr. Hightower recruited Mr. Carter and Mr. Mosley to eliminate Ms. Lisa Edmonds. She was the intended target because she was cooperating in the healthcare case. And so the testimony come in. There's jail calls of Mr. Hightower saying he has to put some things in motion, code for trying to eliminate Ms. Edmonds. Move further down the track, Mr. Hightower ultimately is detained. After he is detained, then Mr. Carter and Mr. Mosley take over the drug business. And there's jail calls to that effect. But to ultimately get Mr. Hightower back on the board, to get him out of prison and to make the healthcare case go away, they have this conspiracy to murder Ms. Edmonds. Unfortunately here, they murdered the wrong individual. And what was the evidence that they agreed to kill Ms. Edmonds? So there's a number of indications that that was the case. So there was first the call that I mentioned. This is, I think, March of 2016. What did they say on that call with respect to wanting them to kill Ms. Edmonds? So the call that is Mr. Hightower saying I have to put some things in motion. He said that. So he says that. Then later down the track, there's a May 16, 2016 call. And this is the one that was being adverted to about how they were meeting. Mr. Carter and Mr. Mosley are at an IHOP having breakfast. Mr. Hightower is detained at that point. And the call comes in, and they all speak together. This is the point at which Mr. Mosley tells Mr. Hightower, I've got everything covered. You're going to beat your charges. I'm going to hold you down. I've got everything covered. You're going to beat your charges. Yes. Anything about murdering anybody? They were not expressly saying we're going to help you beat your charges by murdering somebody. No, implicitly, really. Well, even implicitly. The jury certainly is allowed to take the inference that I'm going to set things in motion.  Well, the jury, I know we take all inferences, but inferences are based on some facts. It's in the sense that based on what you're saying, you don't have any conversation where they agreed to murder her. Is that right? So express conversation. Is that right? It's correct, and I'm trying to answer your question accurately. Express conversations about we need to murder or we need to off or we need to get rid of Ms. Edmonds, they don't say that expressly, no. Okay. What I will tell you that we do have, Your Honor, is a number of indications. There was another co-defendant, Ms. Miles, in the health care fraud case. There were conversations between Mr. Hightower and Ms. Miles saying we think Ms. Edmonds is the snitch. We think she is the one behind this. She's telling on us. And who's saying that? That is Ms. Miles. She's repeating what Mr. Hightower said to her. We think she's a snitch. Otherwise, we think she's the person who implicated me in the Medicare fraud situation. Correct. Ms. Miles is saying that Mr. Hightower said Ms. Edmonds is the snitch. And so that testimony came in front of the jury. It goes to, I guess, motive. It goes to motive. It goes to motive, right? But it also goes to the, as we were talking a minute ago, Your Honor, about the inferences that the jury can draw. So you have this conversation to say we think she's the problem. You also have the drug conspiracy between Mosley and Carter. There's also some testimony from some other individuals where an associate of Mr. Davon Carter, this is Clarence Simpson, he's indicating that Davon Carter said somebody has been telling on Matthew and he's got to go handle it. And so, again, the testimony is, the inference is, this individual heard from Davon. I have to handle a situation because someone was telling on Mr. Hightower. So, you know, that is a small slice of the evidence. There certainly is quite a lot more. There's also the activities that they engaged in. Mr. Carter gets a new burner phone to try to hide his activities. You see Mr. Mosley, who had no reason to look up Ms. Edmonds. He looks up Ms. Edmonds in the Maryland Judiciary case search trying to find out where she lives. There's those calls between Mr. Carter and Mr. Mosley. There's the surveillance video that put the various cars that they were using at the scene. There's obviously the historical cell site, which we've discussed. There was also post-murder evidence of guilty knowledge, in our view. So we have Mr. Mosley who's lying to his girlfriend about his whereabouts on that morning. He's also ignoring her phone calls so that they could just focus on their mission. Interestingly, Mr. Mosley deleted all of his texts with Mr. Hightower after the murder to sort of cover his tracks. There's also the admission to Mr. Mosley's girlfriend that it might not be over for me. They arrested Mr. Carter first. Mr. Mosley, I think, was worried that law enforcement was going to figure out eventually his role in all this. And he said it's not going to be over for me. So you put sort of all those pieces of evidence together. And, again, as you know, this is a very lengthy record. We think we more than meet the sufficiency standard here. Again, it's a very low bar that we have to meet. So there certainly are other issues that have been raised in the briefs. I'm happy to address those questions if the Court has any. But, of course, if the Court doesn't have any further questions, I'm happy to yield the rest of my time. Thank you. Thank you, Your Honor. All right, Mr. Stoker, you have some rebuttal. Thank you, Your Honor. Just briefly, I just want to comment on a couple of things that the government said. That Lisa Edmonds, it's been their position from the beginning that Lisa Edmonds was the intended victim. That's really a matter of speculation. We don't know that Laura Ashburn wasn't the intended victim. All we know is that somebody was shot. We don't know who shot them. There's some speculation that it was Mr. Carter. But maybe it wasn't Mr. Carter. Or even if it was Mr. Carter, maybe it was because Laura Ashburn was the intended victim. We don't know. The jury was asked to speculate, and we don't believe that that amounts to proof beyond a reasonable doubt. Mr. Medinger also mentioned that Mosley did not, or he said that Mosley told Hightower that we have everything covered. Well, that's not exactly what he said. He said that he told Mr. Hightower that Hightower was going to beat his charges. That sounds like encouragement. He said to Hightower, everything's going to be good, yo. You know what I mean? I'm going to hold you down. You know what I mean? That sounds like encouragement to somebody who's accused of a serious crime. It's a long way short of saying we'll take care of taking out the main witness who's going to testify against you. That's quite speculative to make that leap of faith. Mr. Medinger also mentioned that Mr. Mosley had looked up Edmonds on the Maryland Judiciary site. I think that's understandable. One of his very good friends is accused of a serious crime. Why not see who the witness was? Maybe she was in some other legal trouble that would be helpful for Mr. Hightower to know about. Again, speculation. Beyond that, we would rely on the arguments that are in our brief, unless the court has any other questions. We did not address severance. We did not address the Fourth Amendment issues. We're certainly not abandoning those. I'm here to answer any questions the court may have about those matters. If the court does not, then we would submit. I thank the court for appointing me and for its attention this morning. We ask that Mr. Mosley's sentence be set aside. Thank you. Mr. Stoker, I want to acknowledge and thank you for your representation. You know this is a very important aspect of our whole system. Thank you, Your Honor. It's a pleasure to serve. We thank you for your service. Thank you. Do you want to... Okay, you want to take a brief recess? Okay. I'm going to take a brief recess. All right, we'll come down, take a short recess, come down and recount. This honorable court will take a brief recess.
judges: Paul V. Niemeyer, Roger L. Gregory, G. Steven Agee